## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF )
DELL LAPTOP COMPUTER BEARING )
SOFTWARE REGISTRATION CODE )
██████████████ AND BLACKBERRY )
BOLD 9700 BEARING IMEI NUMBER )
████████████ CURRENTLY )
SECURED WITH THE FBI )
WASHINGTON FIELD OFFICE )
LOCATED AT 616 H STREET, N.W., 8TH )
FLOOR, WASHINGTON, D.C. 20001 )

Case: 1:12−mj−00179
Assigned To :Magistrate Judge Kay, Alan
Assign. Date : 02/28/2012
Description: Seach And Seizure  Warrant

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE[1]

I, Special Agent ██████████████, being duly sworn, depose and state as follows:

### I.    DEVICES TO BE SEARCHED

1.    I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant authorizing the examination of a **DELL LAPTOP**

**COMPUTER BEARING SOFTWARE REGISTRATION CODE** ███████████



[1] This Affidavit is in support of separate search warrants for the following addresses:

Although a separate affidavit with a unique caption is being submitted with each of
the warrants, the affidavits are generally identical in substance to one another, particularly
Section II, entitled Introduction and Agent Background, and Section III, entitled Probable Cause
(except subpart F).  Notably, Section I and Section III, subpart F, is different in each Affidavit.
Moreover, because this Affidavit concerns the search of electronic devices (as opposed to
geographic locations), Sections IV, V, and VI are different from the affidavits that are being
submitted in support of the four search warrants for the premises listed above.

(**"DEVICE 1"**) and a **BLACKBERRY BOLD 9700 BEARING IMEI NUMBER** ▮▮▮▮▮▮▮▮ (**"DEVICE 2"**) collectively referred to as the **"DEVICES,"** which are currently in law enforcement possession, and the extraction from the **DEVICES** of electronically stored information described in Attachment B and examination of that information.

## II.    INTRODUCTION AND AGENT BACKGROUND

2.    I am a Special Agent of the Federal Bureau of Investigation (FBI), currently assigned to the Washington, D.C. Field Office, where I conduct investigations into fraud and public corruption.    I have been employed by the FBI ▮▮▮▮▮▮▮▮.    During my employment with the FBI, I have conducted and/or assisted with many criminal investigations involving mail fraud, wire fraud, health care fraud, false claims, and money laundering, among other matters.    I have received specialized training and experience in the investigation and enforcement of the laws of the United States, including training in the preparation, presentation, and service of criminal search warrants.    Through my training at the FBI Academy and my participation in searches and arrests conducted by my squad and other squads, I have assisted and/or participated in the preparation and/or execution of numerous search and arrest warrants.

3.    The facts set forth in this affidavit are based upon my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through training and experience.    The information presented in this affidavit is provided to show sufficient probable cause for the requested warrant.    This affidavit does not set forth all of my knowledge about this matter.

2

4.      I submit that this affidavit establishes probable cause to believe that there exists

on the **DEVICES** evidence, fruits, and instrumentalities of violations of 2 U.S.C. § 441b

(Corporate campaign contributions), 2 U.S.C. § 441f (Contributions in name of another), 18

U.S.C. § 371 (Conspiracy to commit offense or to defraud United States), 18 U.S.C. § 1512(b)(3)

(Tampering with witness), and 18 U.S.C. § 1519 (Destruction of records in federal

investigation).   There is also sufficient probable cause to believe that there exists on the

**DEVICES** evidence, fruits, and instrumentalities of violations of D.C. Code § 22-1805a

(Conspiracy to commit crime or to defraud District of Columbia of lawful government function).


### III.    PROBABLE CAUSE

**A.** *Relevant Persons*

Jeffrey E. Thompson

5.      Jeffrey E. Thompson ("Thompson") is the CEO, Chairman and majority owner

(79.5%) of the public accounting and management consulting firm, Thompson, Cobb, Bazilio &

Associates, PC ("TCBA"), which maintains its principal office at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.   According to its website, TCBA does business with the federal

government, the District of Columbia government, and other state and local governments.

According to the D.C. Office of Contracting and Procurement website, the D.C. government

issued and paid more than $22 million in purchase orders to TCBA for the period 2004 through

2011.

6.      In addition to TCBA, Thompson is the sole owner of a holding company known

as D.C. Healthcare Systems, Inc. ("DCHS"), a healthcare investment company.   On May 17,

2000, DCHS purchased D.C. Chartered Health Plan, Inc. ("Chartered Health").   DCHS wholly

3

owns Chartered Health, and Thompson is Chairman of the Board of Directors of Chartered Health. Chartered Health has provided and continues to provide managed healthcare services to approximately 100,000 D.C. Medicaid recipients pursuant to a contract with the D.C. government. According to their Annual Statement filed with the D.C. government, Chartered Health generated approximately $296 million in revenue in 2010.

### Jeanne Clarke Harris

According the D.C. Department of Consumer and Regulatory Affairs ("DCRA") website, Jeanne Clarke Harris ("Harris") is the registered agent of a company called Belle International Inc. ("Belle") and another company called Details International Inc. ("Details"). She is listed as an authorized signer on the bank account for Belle and recent account statements for both Belle and Details reflect an address of ███████████████████████████████████ ████. These bank records show that for the time period between April of 2010 and September of 2011 the source of most of the deposited funds was from DCHS and TCBA.

### B. *Overview of Schemes*

#### Conduit Contribution Scheme

7.       This investigation has identified a population of contributors consisting of at least 100 individuals and businesses who share some association with Thompson. Based on records maintained by the U.S. Federal Election Commission and the D.C. Office of Campaign Finance ("OCF"), this population of contributors has made campaign contributions in excess of $1.5 million for the period 2000 to 2011. A review of bank records from approximately 2006 to 2011 of some of these individuals indicated that they served as conduits. That review showed that this group received payments by TCBA in the form of checks and wire transfers totaling at least $250,000 and payment by Thompson via personal checks totaling at least $30,000.   Finally, a

4

witness ("W1") – 

████████████████████████ – stated that Thompson engaged in the practice of reimbursing W1, Thompson's family, and other TCBA partners, principals, and employees for campaign contributions.

### The Unreported Campaign in Support of ███████

8.     This investigation has also revealed an unreported campaign in support then-candidate ████████████ through the expenditure of at least $300,000 during the 2010 mayoral primary in D.C. This investigation has shown that these expenses were paid for by Belle and Details. During the same time frame, Belle and Details were paid at least $653,800 by TCBA.

### Obstruction of Justice

9.     During the course of this investigation, W1 reported information to the FBI that causes your affiant to believe that Thompson and Harris are obstructing the criminal investigation. According to W1, Thompson stated that he was aware of an investigation and asked whether W1 would be willing to leave the country. Thompson also advised of his understanding that law enforcement seeks information from a ███████████. As described more fully below, W1 additionally stated that: (1) Thompson requested that W1 collect and box documents maintained by W1, which potentially contained evidence of the scheme under investigation, (2) Thompson directed that a TCBA employee remove e-mail files belonging to Thompson for the time period 2008 through 2010 or 2011, and (3) Harris advised that she "bleached" her computer and that she would take the "rap" for Thompson.

***The Conduit Contribution Scheme***

Bank Records Overview

10.     Bank records, including Thompson's personal account and the TCBA corporate

account, show that Thompson illegally reimbursed TCBA employees, friends, and family for

federal, local, and out-of-state campaign contributions through payments by personal check,

checks drawn on the TCBA account, or wire transfers from TCBA.  Bank records also show that

Belle received a significant source of its deposits from TCBA or DCHS and that Details received

a significant source of its deposits from Thompson, DCHS and Chartered Health.  A review of

Belle's and Details' bank accounts reveals that some of these funds were issued as

reimbursement for campaign contributions.  Finally, bank records show that Thompson gave

funds to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and his businesses; ▮▮▮▮ received TCBA funds as

well.  Some of these funds have been traced to reimbursements made for campaign contributions.

W1's Statements and Bank Records

11.     W1 confirmed that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Thompson maintained

a practice over several years of reimbursing W1, Thompson's family members, and TCBA

partners, principals, and employees for campaign contributions.[2]  W1 specifically identified

---

[2]     During ongoing discussions with law enforcement and the U.S. Attorney's Office for the
District of Columbia, W1 signed a standard "proffer letter" that, among other things, did not
offer W1 immunity from prosecution, required W1 to provide complete, truthful, and candid
responses to all questions put to it by attorneys and agents of the United States, and provided that
no statements made by W1 during the debriefings would be used directly against W1 in the
government's case-in-chief at any criminal trial, except in any proceeding relating to a
prosecution of W1 for perjury or obstruction of justice.  W1 subsequently was given informal use
immunity, coextensive with the scope of use immunity authorized by 18 U.S.C. § 6002, that,
among other things, provided that any information directly or indirectly derived from W1's
statements would not be used against it, except in any proceeding relating to a prosecution of W1
for perjury or obstruction of justice, and required W1 to provide truthful responses to all
questions put to it.

checks and cash deposits that W1 received from Thompson and TCBA as reimbursement for W1's campaign contributions.

12.     A review of W1's bank account for the period between January of 2008 and May of 2011 shows at least thirteen checks totaling $15,400 were drawn on the account in the form of campaign contributions.     These records show concurrent deposits of funds traceable to Thompson and TCBA in the form of checks and a wire transfer; and, these records show concurrent cash deposits.

13.     For example, on February 7, 2008, W1 wrote a $2,300 check from W1's personal bank account in the name of W1 and signed by W1.  This check was made payable to "        for Congress."  At the time,            was a member of the U.S. House of Representatives, representing a congressional district in           and running for re-election.   On February 8, 2008, $2,400 was wired into W1's account from TCBA's account. W1 understood that the $2,400 was a reimbursement for W1's contribution.  W1 explained that it was not unusual to receive extra money as part of the reimbursement.  The extra money is consistent with a review of bank records related to W1's contributions as well a review of the bank records of other conduits.

14.     On October 1, 2010, W1 wrote a $2,400 check from W1's personal bank account made payable to "                        "  At the time,            was a member of the U.S. House of Representatives, representing a congressional district in        and running for a seat in the U.S. Senate.   On October 6, 2010,  W1 deposited a $2,500 check drawn on Thompson's personal bank account; the word "gift" was written in the memo section of the check.  W1 understood that the $2,500 was a reimbursement for W1's contribution.

7

<u>Other Conduit Contribution Examples</u>

15.     A review of the bank records of another TCBA employee indicates that █████████ █████████████████████ at TCBA, reimbursed Conduit A, a TCBA employee.  Bank records for Conduit A show two $2,300 checks (for a total of $4,600) dated November 12, 2007, were drawn on Conduit A's bank account and bear the apparent signature of Conduit A.  The checks were made payable to "█████████████████████"   Conduit A's bank records show a commensurate deposit of a check dated November 14, 2007, for $4,750 drawn on ████████ account.

16.     Conduit A's account records also reflect the deposit of a check from ████████ █████████████████ dated August 28, 2008, in the amount of $2,300; the circumstances of this check are unknown.

17.     Another $2,300 check dated October 30, 2008, was drawn on Conduit A's account and bears Conduit A's apparent signature; the check was made payable to "███████ █████████████████████   On October 31, 2008, Conduit A's bank records show a commensurate deposit of a $2,300 check drawn on TCBA's account.  The TCBA check contains the stamped signature of ████████████████, another ████ at TCBA.

18.     A review of bank records for Conduit B, a principal at TCBA, indicates that Conduit B also participated in the conduit contribution scheme.  Two $2,300 checks (for a total of $4,600) dated February 24, 2011, drawn on an account in Conduit B's name were made payable to the ████████████ Campaign.  One check bears the signature of Conduit B and the other bears the signature Conduit B's presumed spouse.  █████████████████ is a member of the U.S. House of Representatives, representing the congressional district of ████████████ ████ and currently seeking re-election.  Bank records show a commensurate deposit into the

8

Conduit B's account on March 11, 2011, of a $4,600 check drawn on a TCBA account. The TCBA check contains a stamped signature of ▮▮▮▮.

Belle International Inc. and Details International Inc.

19.    A review of bank statements for Belle for the time period of April of 2010 through September of 2011 revealed that individuals had also been paid from that account by check around the same time of their campaign contributions to several D.C. political campaigns.

20.    For instance, bank records for Belle reveal the deposit of a $44,751.45 DCHS check on June 9, 2010; the memo line reflects that the check is for "consulting services" and appears to be signed by Thompson. On June 9, 2010, a check was drawn on the Belle account in the amount of $2,000 made payable to Conduit C and deposited to Conduit C's bank account on June 17, 2010. Bank records for Conduit C reflect that Conduit C issued a check from the same account dated June 9, 2010, for $2,000 made payable to "▮▮▮▮▮▮ for Mayor."

21.    A review of bank records for Conduit D reveals a $500 check dated November 5, 2010, was drawn on the account and made payable to "To Elect ▮▮▮▮▮▮" On November 10, 2010, a check in the amount of $1,000 drawn on Details' bank account was deposited into Conduit D's account.



22.    According to bank records or DCRA filings, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are controlled by ▮▮▮. ▮▮▮ is the registered agent for ▮▮▮ and a signatory on a ▮▮▮ bank account. ▮▮▮ additionally controls a bank account held in the name of ▮▮▮▮▮▮▮▮▮▮▮▮

23.    A review of ▮▮▮ Thompson's, and ▮▮▮ bank records for August and September of 2010 shows at least $149,140 was passed from Thompson and TCBA to ▮▮▮

9

and ▮▮▮▮ as described in the following two charts.  Review of Thompson's bank records show that the following checks were issued directly to ▮▮▮▮

| Date | Check Payor | Payee | Amount |
|---|---|---|---|
| August 9, 2010 | Thompson | ▮▮▮▮ | $9,000 |
| August 9, 2010 | Thompson | ▮▮▮▮ | $9,500 |
| August 9, 2010 | Thompson | ▮▮▮▮ | $4,600 |
| | | Total: | $23,100 |

All of these checks appear to bear the endorsement of ▮▮▮▮ and were cashed.

24.     In addition, a review of bank records shows that Thompson and TCBA wired funds or wrote checks to ▮▮▮▮ and ▮▮▮▮ as follows:

| Statement Date | Payor | Deposited to: | Amount |
|---|---|---|---|
| August 10, 2010 | TCBA | ▮▮▮▮ account | $62,000 |
| August 16, 2010 | TCBA | ▮▮▮▮ account | $36,840 |
| August 23, 2010 | Thompson | ▮▮▮▮ account | $12,000 |
| September 17, 2010 | TCBA | ▮▮▮▮ account | $15,200 |
| | | Total: | $126,040 |

The August 23, 2010, $12,000 check referenced in the chart above contained the word "contribution" in the memo line.  A review of ▮▮▮▮ bank records show that a substantial portion of the deposited funds were subsequently withdrawn as cash within several days of deposit.

10

25.     Review of ▮▮▮▮ bank records reveals that these cash withdrawals appears to have been used to purchase the following bank checks:

| Date of bank check | Remitter | Payee | Amount | Serial Number |
|---|---|---|---|---|
| August 11, 2010 | | Conduit E | $2,000 | 0442353 |
| August 11, 2010 | | Conduit E | $2,000 | 0442354 |
| August 11, 2010 | | Conduit F | $2,000 | 0453206 |
| August 11, 2010 | | Conduit G | $2,000 | 0453207 |
| August 11, 2010 | | Conduit G | $2,000 | 0453208 |
| August 11, 2010 | | Conduit F | $2,000 | 0453209 |

26.     Review of bank records for Conduit E reveals a deposit of bank checks numbered 0442353 and 0442354 totaling $4,000 on or about August 12, 2010.  The records also reveal that the following checks were drawn on Conduit E's account:

| Date per check | Payee | Amount |
|---|---|---|
| August 10, 2010 | Kelvin Robinson | $500 |
| August 10, 2010 | | $2,000 |
| August 10, 2010 | | $2,000 |
| | Total: | $4,500 |

27.     Review of bank records for Conduit F reveals a deposit of bank checks numbered 0453206 and 0453209 totaling $4,000, along with a cash deposit of $1,000 for a total of $5,000, was made on August 11, 2010.  The records also show that a cash deposit of $1,500 was made to Conduit F's account on August 9, 2010.  The bank records reveal the following checks were drawn on Conduit F's account:

| Date per check | Payee | Amount |
|---|---|---|
| August 10, 2010 | | $1,500 |
| August 10, 2010 | | $2,000 |
| August 10, 2010 | | $2,000 |
| August 10, 2010 | Kelvin Robinson for Ward 6 Council | $500 |
| | Total: | $6,000 |

11

28.     Review of bank records for Conduit G reveals a deposit on August 11, 2010, of bank checks numbered 0453207 and 0453208 along with a cash deposit of $800, totaling $4,800. The bank records show that the following checks were drawn on Conduit G's account:

| Date per check | Payee | Amount |
|---|---|---|
| August 10, 2010 | ███████████████ | $2,000 |
| August 10, 2010 | | $2,000 |
| August 10, 2010 | Kelvin Robinson for Ward 6 | $500 |
| | Total: | $4,500 |

29.     Review of bank records for an account in the name of ████████████ ██████████████████ indicates ██████ served as a conduit as well.  The bank records show a cash deposit into that account of $4,800 on August 11, 2010.  The bank records reveal that the following checks were drawn on the account:

| Date per check | Payee | Amount |
|---|---|---|
| August 10, 2010 | ██████████████ | $2,000 |
| August 10, 2010 | | $2,000 |
| August 10, 2010 | Kelvin Robinson for Ward 6 | $500 |
| | Total: | $4,500 |

**C.  *The Unreported Campaign in Support of* ███████████**

30.     A review of bank records for Belle and Details, OCF filings, and business records for various vendors, including vendors for the ██████ Campaign, shows that Belle and Details paid for expenses associated with campaign efforts in support of ██████ for Mayor.

31.     Bank records show substantial deposits in the form of checks and wires to Belle's bank account from TCBA at or near the time that the Belle and Details campaign expenses were incurred and paid for, including the following:

| Deposit Date | Transaction Type | Payor | Payee | Amount |
|---|---|---|---|---|
| July 29, 2010 | Check | TCBA | Belle | $87,800 |
| September 7, 2010 | Check | TCBA | Belle | $180,000 |
| September 10, 2010 | Wire | TCBA | Belle | $76,000 |
| September 10, 2010 | Check | TCBA | Belle | $185,000 |
| September 14, 2010 | Wire | TCBA | Belle | $125,000 |
| | | | Total: | $653,800 |

The memo section of the check deposited on September 10, 2010 for $185,000 contains the word "loan." The Belle bank statement for the month ending September 30, 2010, lists the balance of the account at $910.33.

32.     Under D.C. campaign finance laws, every person who makes contributions or expenditures, other than by contribution to a political committee or candidate, is required to file reports with OCF accounting for all receipts and expenditures. Likewise, every candidate and political committee in support of a candidate for D.C. office must make similar filings. OCF specifies deadline by which these filings must be made. There are criminal penalties for failure to report all receipts and expenditures.

33.     OCF databases show that the ▉ Campaign reported an expenditure of $20,000 "Details International / Consultant" on August 26, 2010. OCF databases do not show any other reported expenditures by Thompson, TCBA, Details, or Belle associated with the expenditures highlighted below.

13



34.     According to its website, ███████ is a local company that designs, fabricates, and installs signs (for campaigns as well as commercial ventures) and sells other promotional and specialty items. Business records produced by ███████ show that it supplied the ███ Campaign with political signage and other promotional campaign items.

35.     Business records of ███████ for customer code ███████ include invoices identifying sales of campaign signage, campaign banners, window graphics, umbrellas, T-shirts, posters, lapel stickers, and yard signs between May of 2010 and September of 2010. ███████

███████ provided records of payment for these invoices, many of which were paid with the following cashier's checks:

| Cashier's Check Date | Cashier's Check No. | Pay to the Order | Remitter | | Amount |
|---|---|---|---|---|---|
| 05/06/2010 | 1300077907 | | | | $15,000.00 |
| 07/01/2010 | 1300080522 | | | for Mayor | $3,500.00 |
| 08/04/2010 | 1300080670 | | | | $10,750.50 |
| 08/16/2010 | 1300088823 | | | for Mayor | $10,750.00 |
| 09/09/2010 | 1300088951 | | | | $2,369.26 |
| 08/04/2010 | 1300080669 | | | | $8,150.00 |
| 08/16/2010 | 1300088822 | | | for Mayor | $850.00 |
| 08/16/2010 | 1300088824 | | | for Mayor | $8,150.00 |
| 09/07/2010 | 1300088936 | | | | $952.00 |
| 09/08/2010 | 1300088941 | | | | $1,484.00 |
| 09/08/2010 | 1300088942 | | | | $8,437.60 |
| 09/10/2010 | 1300088957 | | | | $10,317.51 |
| 09/10/2010 | 1300088958 | | | | $10,684.00 |
| 09/16/2010 | 1300089001 | | | | $5,603.16 |
| 09/30/2010 | 1300089062 | | | | $6,371.50 |
| 09/30/2010 | 1300089061 | | | | $8,183.20 |
| | | | Total: | | $111,552.73 |

36. Bank records reflect that each of these cashier's checks paid to [           ] was purchased with a check drawn on the bank accounts of either Belle or Details.

| Cashier's Check Date | Cashier's Check No. | Purchase Check Date | Purchase Check Payor | Amount |
|---|---|---|---|---|
| 05/06/2010 | 1300077907 | 05/06/2010 | Details | $15,000.00 |
| 07/01/2010 | 1300080522 | 07/01/2010 | Details | $3,500.00 |
| 08/04/2010 | 1300080669 | 08/04/2010 | Belle | $8,150.00 |
| 08/04/2010 | 1300080670 | 08/04/2010 | Belle | $10,750.50 |
| 08/16/2010 | 1300088822 | 08/12/2010 | Belle | $850.00 |
| 08/16/2010 | 1300088823 | 08/12/2010 | Belle | $10,750.00 |
| 08/16/2010 | 1300088824 | 08/12/2010 | Belle | $8,150.00 |
| 09/07/2010 | 1300088936 | 09/07/2010 | Belle | $952.00 |
| 09/08/2010 | 1300088941 | 09/08/2010 | Belle | $1,484.00 |
| 09/08/2010 | 1300088942 | 09/08/2010 | Belle | $8,437.60 |
| 09/09/2010 | 1300088951 | 09/09/2010 | Belle | $2,369.26 |
| 09/10/2010 | 1300088957 | 09/09/2010 | Belle | $10,317.51 |
| 09/10/2010 | 1300088958 | 09/10/2010 | Belle | $10,684.00 |
| 09/16/2010 | 1300089001 | 09/16/2010 | Belle | $5,603.16 |
| 09/30/2010 | 1300089061 | 09/30/2010 | Belle | $8,183.20 |
| 09/30/2010 | 1300089062 | 09/30/2010 | Belle | $6,371.50 |
|  |  |  | Total: | $111,552.73 |

37. OCF databases for this time period do not show the $111,552.73 expenditure by the [   ] Campaign in cashier's checks to [           ] According to OCF databases, during the same time period, the [   ] Campaign reported $11,791.24 in expenditures to [         ] (including a $2,000 "in-kind" contribution). [           ] provided checks drawn on a [   ] Campaign bank account matching reported expenditures of $9,791.24, along with an unreported check of $1,060 dated August 11, 2010.

38. According to its website, [                ] is a full-service communication firm that provides direct mail and online strategies for campaigns, political organizations, and advocacy groups across the country. An e-mail located during the

15

investigation indicates that a ▮▮▮▮▮▮▮▮▮▮▮ employee sent an e-mail to ▮▮▮▮

Campaign officials requesting payment for three invoices, one of which is identified as "GOTV

handout (as per Vernon order) --$5548." A copy of the "GOTV handout" that was provided by

▮▮▮▮▮▮▮▮▮▮ included language that it was "Paid for by ▮▮▮ for Mayor."

▮▮▮▮▮▮▮▮▮ also provided a copy of an invoice issued to "▮▮▮ for Mayor," dated

September 9, 2010, that lists a job name "▮▮▮▮▮GOTV Handout." That invoice included a

total balance due of $5,548.63.

39.     ▮▮▮▮▮▮▮▮▮▮ produced a copy of a cashier's check number

▮▮▮▮▮▮ dated September 21, 2010, in the amount of $5,548.63. The cashier's check lists

the remitter as "▮▮▮▮" and is made payable to "▮▮▮▮▮▮▮▮▮ Bank

records reveal that the cashier's check was purchased using $5,548.63 in funds drawn from

Belle's account. OCF databases show that the ▮▮▮ Campaign did not report a $5,548.63

expenditure to ▮▮▮▮▮▮▮ at or around September 21, 2010.

### Canvassers

40.     According to witness interviews, this investigation has also revealed that Harris

funded a team of canvassers, who dropped literature and knocked on doors in support of ▮▮ for

Mayor in the final weeks leading up to the September 14, 2010, primary.

41.     A political consultant, who was a paid organizer for the ▮▮▮ Campaign,

described a "gold team" of 90-150 persons who were paid in cash for canvassing in support of

▮▮ for Mayor. This consultant stated that the gold team was led by ▮▮▮▮▮▮▮

and that ▮▮ had assistance from several individuals who were from out-of-town.

42.     ▮▮▮ an assistant to ▮▮, reported that ▮▮ was hired by Harris to manage

administrative operations, including payroll, for ▮▮▮ canvassers. The assistant submitted

16

payroll to Harris, and the assistant distributed the cash and money orders that Harris sent to the assistant.

43.    W1 advised that W1 received two invoices for "consulting" or "special projects," totaling approximately $300,000, from Harris during the period of the 2010 mayoral primary. W1 gave the invoices to Thompson for his approval. W1 subsequently had a conversation with the controller of TCBA in which the controller asked W1 about paying "all that money." W1 understood that the controller was referring to the $300,000 invoices from Harris and also that the controller paid the invoices per Thompson's approval. W1 understood that the $300,000 invoices paid by TCBA were related to ▮▮▮ and Harris' efforts in support of electing ▮▮▮ for Mayor.

### D. *Obstruction of Justice*

44.    In mid-February of 2010, W1 was interviewed by the FBI and reported the following.

45.    In October of 2011, Harris told W1 that there was an "investigation" being conducted and that Harris would take the "rap" for Thompson. Harris had previously told W1 in August or September of 2011 that Harris had destroyed her computer and had purchased a new computer.

46.    W1 further reported that in late December of 2011, Thompson asked W1 to box up files for the years 2008 through 2010 contained in W1's office. W1 recalled that Thompson made reference to invoices and bank statements as among the files to be boxed during this conversation. As part of W1's employment responsibilities, W1 kept records of all of the Belle and Details invoices as well as the DCHS bank statements. W1 complied with Thompson's

17

requests and recalled that these boxes were subsequently removed from W1's office shortly thereafter. W1 stated that Thompson saw that W1 had complied with his request.

47.   W1 further reported that at or around 9:30 p.m. on or about Sunday, January 8, 2012, Thompson requested that W1 come to his office. W1 complied and drove to TCBA that evening.   Upon arriving, W1 observed an individual in Thompson's office with boxes. Thompson and W1 went to another office, where Thompson told W1 that an investigation was being conducted. Thompson expressed that he did not want W1 at the office in the event that "someone" (without identifying "someone") shows up. Thompson then asked W1 if it wanted to go to Jamaica for a couple of months. W1 declined, and Thompson asked whether it would consider leaving town to take educational courses elsewhere.[3] Thompson also asked W1 about taking medical leave. Thompson offered to pay for W1's trip to Jamaica and W1 understood Thompson to be offering to pay for educational courses elsewhere. W1 stated that it would consider the offer.

48.   The following morning, on or about January 9, 2012, W1 observed the same individual who was in the conference room the night before shredding documents at TCBA from a box that appeared similar to the boxes W1 had seen the previous evening in Thompson's office.

49.   During late December of 2011 or January of 2012, W1 also observed that Thompson's e-mails no longer appeared on W1's TCBA computer for the time period between 2008 through approximately 2010. W1 was told by a fellow TCBA ███ employee that Thompson

---

[3] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████

had requested that that employee return from out-of-state to remove the files and that the removal was done at Thompson's request.

50.     On or about January 12, 2012, Thompson again asked whether W1 had considered taking a course. W1 decided to leave TCBA and has not returned to the office since that date.

51.     On or about January 19, 2012, Thompson came to W1's home. Thompson told W1 that when "they" come (without identifying "they"), "they" normally go to the ▇▇▇▇▇▇▇▇▇▇▇▇▇ to get all the information from the ▇▇▇▇▇. Thompson then told W1 to take the year off and suggested that he would bring someone else in to do W1's job. Thompson also offered W1 a different position upon W1's return. Thompson told W1 that an individual (whom law enforcement identified as a member of the ▇▇▇ Campaign) had been "down." Finally, he suggested that W1 talk to Harris. Thompson continues to pay W1's salary and benefits.

52.     Between January 20 and January 26, 2012, W1 met Harris at Harris' home. Harris explained that she was aware of an "investigation;" someone had gone "down" and been asked questions about Thompson, Hawkins, and "a shadow campaign." W1 understood that the "shadow campaign" referred to the 2010 mayoral primary in D.C. Harris reiterated that she would take the "rap" for Thompson and stated that "they" (without identifying "they") had issued 25 subpoenas.

53.     W1 also told the FBI about a conversation that occurred after W1 stopped reporting to the office on January 12, 2012, with a former member of the ▇▇▇ Campaign, ▇▇▇▇▇▇ driver, regarding the "investigation." During that conversation, ▇▇▇▇▇ driver told W1 that he had been asked to go to London but did not identify who had asked him to leave.

19

54.     Finally, W1 reported that Harris' business assistant told W1 that as a result of the "investigation," Harris' business assistant was no longer reporting to work for Harris but continues to draw a salary.

**E.** *Probable Cause to Search the DEVICES*

55.     The **DEVICES** were provided by W1 to the FBI pursuant to a Grand Jury subpoena on February 17, 2012.  On the same date, the **DEVICES** were brought by an FBI agent to the FBI office in Manassas, Virginia, where an imaged copy of the data of **DEVICE 1** was made and the logical files extracted from **DEVICE 2**.  Generally speaking, imaging is the taking of an exact electronic copy of an electronic device's data, including all hidden sectors and deleted files.  Imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media and to prevent the loss of the data either from accidental or intentional destruction.  In this case, an imaged copy of the data of **DEVICE 1** was made and the logical files extracted from **DEVICE 2** in order to preserve evidence in the event that Thompson attempts to have data files deleted remotely.  No attempt has been made to examine the contents of the **DEVICES**.

56.     W1 consented to forensic examination of both **DEVICES**.  W1 provided the password for **DEVICE 1** as well as for Thompson's e-mail account and its own e-mail account. W1 stated that **DEVICE 2** is not password-protected.

57.     While the FBI might already have all necessary authority to examine the **DEVICES** based on W1's consent, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **DEVICES** will comply with the Fourth Amendment and other applicable laws.

20

58.   During W1's tenure at TCBA, TCBA provided, among other things, the **DEVICES** to W1.  Since W1 began its paid leave on January 12, 2012, no one from TCBA has sought the return of the **DEVICES**.

59.   During the time period of the events described herein, W1 accessed both its own TCBA e-mail as well as Thompson's TCBA e-mail through the **DEVICES**.  It was in part W1's responsibility to monitor Thompson's e-mail, as Thompson did not use a computer.  W1 had two separate e-mail operations running simultaneously on the **DEVICES** as well as its computer located at TCBA: W1's e-mail and Thompson's e-mail.  If an e-mail came to Thompson, W1 would print it and give it to Thompson.  If a response was required, Thompson would handwrite the response on the printed e-mail copy, and W1 would then respond to the e-mail based on Thompson's handwritten note.

60.   W1 reported that Thompson regularly hosted political fundraisers at TCBA.  W1 e-mailed invitations for the fundraisers from either Thompson's e-mail account or W1's own e-mail account to a list of invitees.  The invitees were sometimes designated by Thompson.  The invitation would include the name of the candidate, the maximum limit of the contribution, and to whom the check should be made payable.  Thompson would inquire of W1 who had responded to the invitation, and W1 would refer to Thompson's e-mail in order to prepare a list of respondents.  W1 reported that Thompson reimbursed some contributors at these fundraisers.

61.   W1 received invoices from Belle and Details through its TCBA e-mail.  W1 retained all such invoices in a subfolder in W1's e-mail account.

62.   Before their meeting on approximately January 25, 2012, W1 received text messages on **DEVICE 2** from Harris setting up the meeting.  W1 recalled deleting the text messages.

21

63.     The **DEVICES** are now being stored at the FBI Washington Field Office at 616 H

Street, N.W., 8th floor, in Washington, D.C.  The image of **DEVICE 1** and the logical files of

**DEVICE 2** currently are in storage with the Computer Analysis Response Team ("CART") at

the FBI, 9325 Discovery Blvd., Manassas, VA 20109.  In my training and experience, I know

that the **DEVICES** have been stored in a manner in which their contents are, to the extent

material to this investigation, in substantially the same state as they were when they first came

into the possession of the FBI.


## IV.     TECHNICAL TERMS

64.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
        telephone) is a handheld wireless device used for voice and data communication
        through radio signals.   These telephones send signals through networks of
        transmitter/receivers, enabling communication with other wireless telephones or
        traditional "land line" telephones.  A wireless telephone usually contains a "call
        log," which records the telephone number, date, and time of calls made to and
        from the phone.   In addition to enabling voice communications, wireless
        telephones offer a broad range of capabilities. These capabilities include: storing
        names and phone numbers in electronic "address books;" sending, receiving, and
        storing text messages and e-mail; taking, sending, receiving, and storing still
        photographs and moving video; storing and playing back audio files; storing
        dates, appointments, and other information on personal calendars; and accessing
        and downloading information from the Internet.  Wireless telephones may also
        include global positioning system ("GPS") technology for determining the
        location of the device.

    b.  Digital camera:  A digital camera is a camera that records pictures as digital
        picture files, rather than by using photographic film.  Digital cameras use a
        variety of fixed and removable storage media to store their recorded images.
        Images can usually be retrieved by connecting the camera to a computer or by
        connecting the removable storage medium to a separate reader.  Removable
        storage media include various types of flash memory cards or miniature hard
        drives.  Most digital cameras also include a screen for viewing the stored images.

22

This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control

a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## V. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

65.    As described above, this application seeks permission to search and seize records on the **DEVICES**. The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

66.    Based on my training, experience, and research, and collaboration with other law enforcement officers, I know that **DEVICE 2** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, Global Positioning System (GPS) navigation device, and personal digital assistant (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

67.    Based on my knowledge, training, experience, and collaboration with other law enforcement officers, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

68.    There is probable cause to believe that things that were once stored on the **DEVICES** may still be stored there, for at least the following reasons:

24

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

69. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how the **DEVICES** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **DEVICES** because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage device or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.   Forensic evidence on a computer can also indicate who has used or controlled the computer.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled a computer at a relevant time.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

26

70.     Searching storage media for the evidence described in Attachment B may require a range of data analysis techniques.  It is possible that the **DEVICES** will contain files and information that are not called for by the warrant.  In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant is immediately apparent.  In most cases, however, such techniques may not yield the evidence described in the warrant.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.

71.     As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited but that remnants are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

72.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **DEVICES** consistent with the warrant.  The examination may require authorities to employ techniques,

including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **DEVICES** to human inspection in order to determine whether it is evidence described by the warrant.

73. *Manner of execution.* Because this warrant seeks only permission to examine the **DEVICES** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

74. W1 stated that it believed that both **DEVICES** were still live and receiving incoming texts, phone calls, and e-mails on February 17, 2012, the date the **DEVICES** were turned over to law enforcement and either imaged or the logical files extracted. This warrant seeks permission to examine the **DEVICES** for evidence as of the February 17, 2012, date; it does not seek permission to examine the **DEVICES** for texts, phone calls, and e-mails received after the February 17, 2012, imaging date.

## VI. POTENTIAL PRIVILEGED DOCUMENTS

75. It is possible that some materials located in the **DEVICES** could be protected by the attorney-client privilege because Thompson and Harris are aware of this investigation. In order to avoid exposure of the investigating team to protected material, a filter team has been established, consisting of a filter agent, Assistant U.S. Attorneys, and a supervising Assistant U.S. Attorney, to conduct a privilege review. I have arranged for the filter team to review all of the materials collected as potentially privileged and engage with defense counsel as necessary. Any potentially privileged materials seized pursuant to this Search Warrant will not be reviewed by the investigating team, including your affiant, unless and until the privilege is waived or

28

otherwise determined to be inapplicable.  The agent members of the investigating team will not search for, view, or discuss any documents or other materials that may contain attorney-client privileged communications.

## VII.  CONCLUSION

76.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **DEVICES** described in Attachment A to seek the items described in Attachment B.

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 28 day of February 2012.

Alan Kay
UNITED STATES MAGISTRATE JUDGE